IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Alan Crocker, | ) | C/A No.: 1:11-1629-CMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Michael J. Astrue, Commissioner, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a

Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a)

(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to

obtain judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two

issues before the court are whether the Commissioner's findings of fact are supported by

substantial evidence and whether he applied the proper legal standards. For the reasons

that follow, the undersigned recommends that the Commissioner's decision be reversed

and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

        On August 3, 2006, Plaintiff filed an application for DIB under the Social Security

Act ("the Act"), 42 U.S.C. §§ 401–433. Tr. at 102–04. In his application, he alleged his

disability began on July 1, 2006. Tr. at 102. His application was denied initially and

upon reconsideration. Tr. at 54, 56. On May 11, 2009, Plaintiff had a hearing before an Administrative Law Judge ("ALJ"). Tr. at 31–49 (Hr'g Tr.). The ALJ issued an unfavorable decision on June 4, 2009, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 21–30. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 6, 2011. [Entry #1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 36 years old at the time of the hearing. Tr. at 34. He completed the ninth grade. Tr. at 35. His past relevant work ("PRW") was as a construction worker and video gaming salesperson/technician. Tr. at 120. He alleges he has been unable to work since July 1, 2006. Tr. at 102.

2.     Medical History

The medical evidence prior to Plaintiff's alleged onset date showed he had a history of treatment for Legg-Calvé-Perthes disease beginning in 1980 with medications and orthotics. Tr. at 159–60, 163, 165, 169–70, 172, 210–33. In November 2005, Plaintiff presented to Orthopedic Specialties of Spartanburg with complaints of left hip pain. Tr. at 248. Marcus Cox, a physician assistant, stated that Plaintiff had left hip pain

due to osteoarthritis secondary to Legg-Calvé-Perthes disease and recommended left total hip arthroplasty with ceramic head and liner and leg lengthening. Tr. at 248–49, 251–52.

Plaintiff underwent left hip arthroplasty in December 2005. Tr. at 234–35, 240–41, 247. In his pre-operative visit, Mark Visk, M.D., noted that Plaintiff complained of near-permanent pain in the joints in his hips, knees, and feet. Tr. at 236. Plaintiff also reported being depressed over a lot of family problems and stress at work. Tr. at 246. The month after the surgery, Dr. Visk found that Plaintiff was "doing very well." Plaintiff had "a lot of pain initially, but th[is] seem[ed] to have subsided, and his pain level [was] more controlled" with oral pain medications. *Id.* In March 2006, Mr. Cox noted Plaintiff was "doing quite well" and reported "very minimal pain in his hip and some relatively mild limitations in his range of motion." Tr. at 245. Plaintiff was "back at work and doing well with [] light duty." *Id.* Mr. Cox stated Plaintiff should continue with light duty for three months and instructed him to return as needed. *Id.*

On June 23, 2006, Helen Marie Clarke, Ph.D., a state agency psychologist, reviewed the evidence and found there was "insufficient evidence" to evaluate Plaintiff's mental impairments. Tr. at 196–209.

In May 2006, Randall Moss, M.D., Plaintiff's primary provider, prescribed Lexapro for stress and anxiety. Tr. at 255. In August 2006, Plaintiff presented to Dr. Moss with complaints of pain in his hands and stress. Tr. at 256. Dr. Moss diagnosed hypertension and Legg-Calvé-Perthes disease. Tr. at 256, 282, 326. In October, Dr. Moss stated that Plaintiff had stress and anxiety for which he took Klonopin (an anti-

anxiety medication). Tr. at 257. He noted Plaintiff was fully oriented and had appropriate thought content. *Id.* He had a worried, anxious, and flat affect, but Dr. Moss said he had only "mild" work-related limitations due to a mental condition and was capable of managing his funds. *Id.* In November 2006, Dr. Moss diagnosed Plaintiff with hypertension, degenerative joint disease, and Legg-Calvé-Perthes disease and prescribed Lortab and Klonopin. Tr. at 282, 326.

On December 6, 2006, Rhonda Crocker, Plaintiff's wife, reported that Plaintiff did some of the cooking, washed dishes, watched television, sometimes read the newspaper, went to the grocery store, attended church, went out to eat, drove without any problems, and remembered to take his medications with no reminders. Tr. at 258. She stated that his main problem was his physical problem and that he did not see a mental health doctor. *Id.*

On December 7, 2006, Lisa Varner, Ph.D., a state agency psychologist, reviewed the evidence and completed a Psychiatric Review Technique ("PRT") form. Tr. at 259–72. Dr. Varner found Plaintiff had non-severe affective and anxiety-related disorders resulting in no restriction of activities of daily living ("ADLs"), difficulties in maintaining social functioning, or episodes of decompensation. Tr. at 259, 269. Dr. Varner opined that Plaintiff had mild difficulties in maintaining concentration, persistence, or pace. Tr. at 269.

On January 3, 2007, William Hopkins, M.D., a state agency physician, reviewed the evidence and completed a Physical Residual Functional Capacity ("RFC")

4

Assessment.  Tr. at 273–80.  He found Plaintiff could perform medium work that did not require more than occasional climbing of ladders, ropes, or scaffolds, kneeling, crouching, or crawling.  Tr. at 275.

In February 2007, Plaintiff presented to Ronn Radcliff, D.C., with complaints of low back and neck pain.  Tr. at 283–87.  Dr. Radcliff noted that Plaintiff had a lump in his neck area and recommended an MRI study to evaluate it.  Tr. at 287.  Dr. Radcliff explained that he would be unable to adjust Plaintiff's neck with the mass present, at which point Plaintiff became angry and said he did not care about the mass and demanded that Dr. Radcliff just adjust it.  *Id.*  Dr. Radcliff refused, after which Plaintiff said that "he would not be back and stormed out." *Id.*  Dr. Radcliff's assessment included sciatica neuritis, segmental dysfunction of the lumbar and cervical spine, and acquired deformity of the pelvis.  *Id.*

On April 18, 2007, Dale Van Slooten, M.D., a state agency physician, reviewed the evidence, and completed a Physical RFC Assessment wherein he stated that Plaintiff could perform medium work that did not require more than occasional climbing of ladders, ropes, or scaffolds, kneeling, crouching, or crawling.  Tr. at 303–10.

That same day, Debra Price, Ph.D., a state agency psychologist, reviewed the evidence and completed a second PRT.  Tr. at 289–302.  She found Plaintiff to have non-severe affective and anxiety-related disorders.  Tr. at 289.  She opined that he had mild limitations in maintaining social functioning and concentration, persistence, and pace.  Tr. at 299.

Plaintiff returned to Dr. Moss on May 15, 2007.  Tr. at 325.  Dr. Moss' staff informed Plaintiff that he must pay for his care up front before undergoing treatment.  *Id.* Plaintiff said he understood, but that he was "not getting much work" and did not have much or sometimes any money and if he did not have money for his next visit he would not be able to get his medications.  *Id.*  On August 15, 2007, Plaintiff saw Dr. Moss at his attorney's expense.  Tr. at 324.  He complained of headaches and pain in his neck and leg.  *Id.*  Dr. Moss found Plaintiff had a flat affect.  *Id.*  Dr. Moss' diagnoses included Legg-Calvé-Perthes disease and "moderate to severe" depression and he prescribed Citalopram (an antidepressant).  *Id.*

On October 30, 2007, Dr. Moss stated that Plaintiff should not engage in any job requiring climbing stairs and ladders, bending, stooping, squatting, pushing, pulling or using his feet to repetitively operate machine controls.  Tr. at 312–13.  He noted Plaintiff had "moderately severe" pain and opined that he would ultimately need a hip replacement on the right side.  Tr. at 312.  Dr. Moss further opined that Plaintiff's pain would substantially interfere with normal work pace for eight hours per day, five days per week and would create "frequent" interruptions of his efforts to complete work activity in a timely manner.  *Id.*  He said Plaintiff's pain would be "distracting," interfering with focus, concentration, and ability to work at an adequate pace.  *Id.*  He said Plaintiff could lift and carry 10 pounds occasionally and should not engage in a job requiring frequent lifting.  *Id.*  He opined that Plaintiff could not sit for more than three to four hours in an eight-hour day, would need to change positions every 15 minutes, and could stand and

walk for less than two hours in an eight-hour day. Tr. at 313. He noted that he frequently performed pre-employment physicals for employers and, in his opinion, he "would never be able to pass [Plaintiff] for any employment." *Id.* He stated Plaintiff had "obvious intellectual limitations" and there "[was] nothing here in terms of work capacity that [was] likely to improve in the next 36 months." *Id.*

On February 1, 2008, David Tollison, Ph.D., examined Plaintiff. Tr. at 314–18. He found Plaintiff was alert and responsive to inquiry and was oriented times four. Tr. at 315. He had simple, but intact associations. *Id.* His thought processes were "a bit scattered and dull," but intact. *Id.* He had somatic thought content and grossly normal memory. *Id.* He could recite the days of the week and months of the year in reverse order, mentally calculate the equation 100 minus seven, spell the word "world" forward and backward, and had no hallucinations, delusions, or psychotic symptoms. Tr. at 316. Dr. Tollison found Plaintiff had moderate intensity of psychomotor agitation throughout his evaluation with shaking of hands, excessive verbalization, and other nervous gestures. *Id.* He could sit and rise from a chair without assistance and ambulated independently (although he had a marked antalgic gait with a limp favoring the left leg that was approximately one-and-one-half inches shorter than the right). *Id.* He had a blunted affect, anxious mood, and normal facial expressions and was polite and cooperative throughout his evaluation. *Id.*

Dr. Tollison administered the Wide Range Achievement Test (Third Edition), which demonstrated that Plaintiff read at a fifth-grade level. *Id.* He also adminstered the

Minnesota Multiphasic Personality Inventory. *Id.* The test indicated that pain, suffering, and functional limitation likely occupy much of Plaintiff's thought, attention, and concentration. *Id.* Dr. Tollison noted that Plaintiff had anxiety that was significant in intensity, moderate depression, and impaired cognitive functioning. *Id.*

Plaintiff reported that he visited his cousin locally and saw his children for three days every other week. *Id.* He said he attended church about five or six times per year, had a driver's license and drove, occasionally went to the grocery store for an item or two, and cared for his personal hygiene. Tr. at 317.

Dr. Tollison opined that Plaintiff would have difficulty learning, remembering, and carrying out instructions repetitively as well as maintaining concentration and attention over time. *Id.* He further opined that Plaintiff was expected to be easily distracted due to his co-morbid condition. *Id.* He noted that Plaintiff had high anxiety and stated that it was unlikely that he could complete a series of workdays without interruption from psychological symptoms. *Id.* Dr. Tollison stated Plaintiff was vulnerable to stress and demand situations and was expected to deteriorate psychologically when confronted with such demands. *Id.* He opined that Plaintiff's pain intensity was increased with physical activity and he would need an unreasonable number and length of rest periods. *Id.* He found that Plaintiff's condition was chronic and expected it to continue during the following twelve or more months. *Id.* Dr. Tollison diagnosed anxiety-related disorder, affective disorder, and somatoform disorder and assigned a GAF score of 45. Tr. at 318.

On February 21, 2008, Plaintiff reported to Dr. Moss that his Klonopin and Lortab were stolen. Tr. at 323. Dr. Moss explained he could not re-write these prescriptions until March 8, 2008. *Id.* On April 9, 2008, Plaintiff underwent a lumbar spine x-ray, which showed no acute abnormality. Tr. at 320. On July 17, 2008, Plaintiff underwent lumbar spine and pelvic x-rays that showed "minimal" discopathy at L4–5, lumbar spinal levorotoscoliosis, facet tropism at L3–4, total hip replacement on the left side, and normal right hip. Tr. at 329.

On July 31, 2008, Plaintiff underwent chiropractic care by Bruce Mikota, D.C. Tr. at 338–40. Plaintiff underwent bilateral hip x-rays on October 14, 2008, which showed no signs of fracture, dislocation, or loosening. Tr. at 327. He also underwent a lumbar spine x-ray, which was unremarkable. Tr. at 328. Plaintiff continued chiropractic care by Dr. Mikota in the August through November of 2008. Tr. at 331–37.

On December 2, 2008, Plaintiff underwent a lumbar spine MRI study that showed "mild to moderate" spondylosis with central spinal canal and neural foraminal narrowing. Tr. at 343–44. The greatest degree of narrowing or encroachment was at L4–5 where a "moderately" bulging disc was surmounted by a small focal midline to paramidline left herniation of the disc material. Tr. at 344–45. The following day, he underwent bilateral hip MRI studies which showed "mild" degenerative joint changes in the right hip. Tr. at 341. On December 8, 2008, Dr. Moss diagnosed hand osteoarthritis and prescribed medications. Tr. at 346.

On January 13, 2009, Dr. Moss prescribed Lortab and Klonopin to Plaintiff.  *Id.* Dr. Moss stated that MRI studies conducted the prior December confirmed his prior opinions regarding Plaintiff.  Tr. at 347.  On April 10, 2009, Plaintiff underwent bilateral hand x-rays, which were unremarkable.  Tr. at 348–49.

On May 6, 2009, Dr. Moss stated that Plaintiff was unable to do a cardiac stress test due to his inability to maintain the pace of walking required for the test.  Tr. at 351. He stated Plaintiff could not walk any significant distance with enough speed to get his heart rate up.  *Id.*  He opined that Plaintiff would have to change positions frequently, even if he worked a sedentary job, due to his hip and low back pain.  *Id.*  He also noted Plaintiff demonstrated a limited education and intellectual and emotional problems with depression which he opined would cause difficulty maintaining concentration on even simple tasks.  *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the May 11, 2006 hearing, Plaintiff testified that he previously worked delivering video poker machines and as a laborer doing roofing, painting, and pouring concrete.  Tr. at 36–37.  He stated that his lower back and legs hurt when he worked as a laborer, but that he worked for 14 years.  Tr. at 37–38.  He said he could not sit or drive for very long.  Tr. at 37, 39.  He said the "intense pain 24/7" in his back and legs prevented him from working.  Tr. at 40.  He testified that he was in pain even with pain

medication and had trouble sleeping at night.  *Id.*  He said he spends most of the day sitting or lying around watching television.  Tr. at 40, 44.  He stated he can walk for 15 or 20 minutes and then has to sit or lie down.  Tr. at 41.

b.    Vocational Expert Testimony

Vocational Expert ("VE") George Mark Leaptrot reviewed the record and testified at the hearing.  Tr. at 44–48.  The VE categorized Plaintiff's PRW as a construction worker as heavy, unskilled work and his job doing route delivery sales as medium, semi-skilled work.  Tr. at 45.  The ALJ described a hypothetical individual of Plaintiff's vocational profile who could do light work, occasional posturals, and simple, routine, and repetitive work.  *Id.*  The VE testified that the hypothetical individual could perform the following light, unskilled jobs: garment sorter (DOT 222.687-014) (3,000 jobs in South Carolina; 180,000 nationally); box sealer/inspector (DOT 641.687-014) (1,150 jobs in South Carolina; 250,000 nationally); and gate keeper (DOT 372.667-030) (1,500 jobs in South Carolina; 250,000 nationally).  Tr. at 45–46.

The ALJ then added a sit/stand option to the hypothetical.  Tr. at 46.  The VE stated the hypothetical individual would still be able to perform the jobs of gate keeper and box sealer/inspector as well as the light, unskilled job of information clerk (DOT 237.367-018) (2,400 jobs in South Carolina; 144,000 nationally).  *Id.*

The ALJ presented a third hypothetical restricting an individual of Plaintiff's vocational profile to sedentary work, occasional posturals, and simple, routine, and repetitive work.  *Id.*  The VE testified that the hypothetical individual could perform the

following sedentary, unskilled jobs: surveillance systems monitor (DOT 379.367-010) (1,200 jobs in South Carolina; 185,000 nationally); cigar-head piercer (DOT 529.685-058) (2,000 jobs in South Carolina; 75,000 nationally); and carding machine operator (DOT 681.685-030) (2,750 jobs in South Carolina; 150,000 nationally). *Id.*

The ALJ then asked the VE to assume the hypothetical individual was limited in the ways described by Plaintiff at the hearing. Tr. at 47. The VE testified that Plaintiff's testimony regarding being in a great deal of pain and only being able to sit around and watch television would prevent being able to work. *Id.*

Plaintiff's attorney asked the VE to consider a hypothetical individual of Plaintiff's vocational profile with the same limitations as the VE's first hypothetical who could stand and walk in combination for less than two hours, sit for a total of three hours, and have to change position every 15 minutes if he was sitting. Tr. at 47–48. The VE stated that the hypothetical person would not be able to work full-time or engage in competitive employment. Tr. at 48. Plaintiff's attorney then presented a hypothetical involving no physical limitations, but assuming that the hypothetical individual would have difficulty learning, remembering, and carrying out instructions and repetitively maintaining concentration and attention over time; was easily distracted due to his pain and psychological problems; and could not complete a series of work days without interruption from psychological symptoms. *Id.* The VE testified that such limitations would prevent employment. *Id.*

2.     The ALJ's Findings

In his June 4, 2009 decision, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.
2.     The claimant has not engaged in substantial gainful activity since June 26, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*).
3.     The claimant has the following severe impairments: degenerative joint disease, degenerative disc disease, and history of Legges-Prethes disease (20 CFR 404.1520(c)).
4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525 and 404.1526).
5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity for light work as defined in 20 CFR 404.1567(b) that allows a sit/stand option and that requires no more than occasional posturals (climbing, balancing, stooping, crouching, kneeling and crawling).
6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).
7.     The claimant was born on March 1, 1973 and was 33 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date. (20 CFR 404.1563).
8.     The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).
9.     Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).
11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 26, 2006 through the date of this decision (20 CFR 404.1520(g)).

Tr. at 21–30.

D.     Appeals Council Review

Plaintiff submitted additional medical records to the Appeals Council.  Plaintiff underwent six follow-up evaluations with Dr. Moss from April 2009 through October 2010.  Tr. at 367–68, 373, 382.  Dr. Moss continued to note complaints of pain and depression and to prescribe Lortab and Xanax.  *Id.*  On April 13, 2009, Dr. Moss's office informed Plaintiff that an x-ray was negative for arthritis.  Tr. at 368.  Plaintiff stated that his attorney wanted him to have an MRI, but Dr. Moss refused.  *Id.*  On January 14, 2010, Dr. Moss prescribed a cane for Plaintiff.  Tr. at 360.

On December 21, 2010, Frank Phillips, M.D., evaluated Plaintiff for left knee pain upon referral by Dr. Moss.  Tr. at 385.  During the visit, Plaintiff complained of back pain more than anything else.  *Id.*  On examination, Plaintiff was noted to be alert and oriented and in no acute distress.  *Id.*  He had mild swelling in the left knee, weakness of his EHL on the left, pain with straight leg raising both sitting and supine accentuated with dorsiflexion of the foot, decreased ankle jerk on the left compared to the right, some patchy decreased sensation along the lateral leg, and tenderness in his lower back limiting his spine motion in all planes.  *Id.*  Dr. Phillips limited the pertinent physical examination to Plaintiff's left knee and found that he had full flexion and extension.  *Id.*  Plaintiff had significant hip abductor weakness.  *Id.*  Dr. Phillips diagnosed left knee pain secondary to patellofemoral pain with sciatica, but noted that an arthritis series of the left knee failed to show any acute boney abnormality.  *Id.*  He explained that he would not be taking care of

14

Plaintiff's sciatica or back problems, but would give him strengthening exercises and see him on as as-needed basis. *Id.* Dr. Phillips noted that Dr. Moss would manage Plaintiff's pain medications. *Id.* Plaintiff was given exercise for patellofemoral and core strengthening. *Id.*

## II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) The ALJ erred in failing to perform the Psychiatric Review Technique on Plaintiff's mental impairments;

2) The ALJ improperly accorded little weight to the opinion of Dr. Moss;

3) The ALJ improperly assessed the opinion of Dr. Tollison;

4) The ALJ erred in failing to perform a function-by-function assessment and failing to consider Plaintiff's impairments in combination; and

5) The ALJ erred in concluding Plaintiff's impairments did not meet or equal a Listing.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A. Legal Framework

#### 1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520.

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence."  *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    The ALJ Erred in Evaluating the Severity of Plaintiff's Mental Impairments

Plaintiff argues the ALJ erred in failing to properly consider his mental impairments at step two using the Psychiatric Review Technique ("special technique") required by 20 C.F.R. § 404.1520a. [Entry #17 at 19–23]. At step two of the five-step evaluation process, the ALJ must follow the special technique to determine the severity of a claimant's mental impairments. 20 C.F.R. § 404.1520a(a). Under the special technique, the ALJ first evaluates the claimant's pertinent symptoms, signs, and laboratory findings to determine if the claimant has a medically-determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). Then the ALJ rates the claimant's degree of functional limitation resulting from the impairment. 20 C.F.R. § 404.1520a(b)(2). The rating determines whether the claimant's impairment is severe or not severe. 20 C.F.R. § 404.1520a(d).

To rate a claimant's degree of functional limitation, the ALJ considers four broad functional areas: ADLs; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). To arrive at a rating, the ALJ considers factors such as "the quality and level of [the claimant's] overall functional performance, any episodic limitations, the amount of supervision or assistance [the claimant] require[s], and the settings in which [the claimant is] able to function." 20 C.F.R. § 404.1520a(c)(2). The ratings for the first three functional areas—ADLs; social

functioning; and concentration, persistence, or pace—consist of a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). For the fourth functional area—episodes of decompensation—the ALJ uses a four-point scale: none, one or two, three, and four or more. *Id.* If the ALJ rates the claimant's degree of limitation as none or mild in the first three functional areas and none in the fourth functional area, the ALJ will usually conclude the claimant's impairment is not severe,[3] "unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1).

Here, the ALJ discussed Plaintiff's allegations of depression and anxiety at step two, but did not specifically consider the four broad functional areas employed by the special technique in determining the degree of Plaintiff's functional limitation. Rather, he noted the opinion of Dr. Moss that Plaintiff's mental condition resulted in a mild work-related functional limitation and described and provided reasons for discounting Dr. Tollison's opinion that Plaintiff's mental condition prevented substantial gainful activity. Tr. at 23–24. He also noted that Plaintiff was never referred for formal mental health treatment and was never hospitalized for psychiatric reasons. Tr. at 24. Finally, the ALJ assigned great weight to the agency consultants who found that Plaintiff had no severe mental impairment. Tr. at 25.

---

[3] "An impairment or combination of impairments is not severe if it does not significantly limit [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a).

The Commissioner contends that the ALJ complied with the special technique in finding that Plaintiff's "alleged mental impairments result[ed] in no more than mild limitations of functioning and [were] 'not severe' as that term is defined in the Social Security Act." [Entry #19 at 12]. The Commissioner further contends that the ALJ's conclusion is supported by the great weight he assigned to the state agency psychologists who specifically addressed the four functional areas set forth above. *Id.*

The undersigned concludes that the ALJ did not properly follow the special technique. He did not address how Plaintiff's alleged mental impairments impacted his ADLs; social functioning; or concentration, persistence, or pace. The ALJ also did not address whether Plaintiff had experienced any episodes of decompensation.

The Fourth Circuit has not addressed whether the ALJ's failure to comply with 20 C.F.R. § 404.1520a necessitates remand. Other circuits considering the issue are split on whether such a failure mandates remand or whether the error may be held harmless. *See Shivel v. Astrue*, 260 Fed. Appx. 88, 91 (10th Cir. 2008) (finding the Appeals Council's failure to comply with 20 C.F.R. § 404.1520a required remand); *Selassie v. Barnhart*, 203 Fed. Appx. 174, 176 (9th Cir. 2006) (holding that ALJ's failure to document his application of the special technique was legal error), *and Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005) (holding that where a claimant has presented a colorable claim of mental impairment, the social security regulations require the ALJ to complete a PRT form and append it to the decision, or incorporate its mode of analysis into his findings and conclusions and a failure to do so requires remand); *with Rabbers v.*

*Commissioner of Social Sec. Admin.*, 582 F.3d 647 (6th Cir. 2009) (finding that when faced with an ALJ's failure to employ the special technique, "a reviewing court need only ask whether the record indicates that the claimant's mental impairment would have ultimately satisfied the B criteria"); *and Lazore v. Astrue*, No. 5:07–276, 2010 WL 3907769, at *7 (N.D.N.Y. Sept. 30, 2010), *aff'd by* 443 Fed. Appx. 650 (2d. Cir. 2011) (finding that ALJ's failure to document his findings specific to the four functional areas was harmless because the ALJ assessed in detail claimant's daily activities, ability to function socially and in the workplace, and his ability to maintain attention and concentration).

The Commissioner does not make a harmless error argument in response to Plaintiff's argument on this issue. Even if he had, the ALJ's step two analysis of Plaintiff's mental impairments does not appear to justify extending the harmless error doctrine to this case. While Dr. Moss's opinion regarding the effect of Plaintiff's mental limitations is compelling, the undersigned finds troubling the ALJ's decision to rely on the treater's opinion as to Plaintiff's mental limitations, but to disregard it as to Plaintiff's physical impairments. Furthermore, unlike the *Lazore* case, the ALJ did not assess Plaintiff's daily activities, ability to function socially and in the workplace, and his ability to maintain attention and concentration in the step two analysis. For these reasons, the undersigned is constrained to recommend remanding this matter to the ALJ for an analysis of Plaintiff's mental impairments in compliance with 20 C.F.R. § 404.1520a.

2.     Plaintiff's Remaining Allegations of Error

Because the undersigned recommends remand based on the ALJ's failure to employ the special technique, Plaintiff's remaining allegations of error are not addressed. However, on remand, the undersigned recommends directing the ALJ to provide greater explanation for his treatment of the opinions of Drs. Moss and Tollison, including specific record references upon which he relies in concluding that the opinions are not supported by the medical evidence. The undersigned further recommends directing the ALJ to adequately explain his evaluation of the combined effects of Plaintiff's impairments in compliance with *Walker v. Bowen*, 889 F.2d 47 (4th Cir. 1989), and his assessment of Plaintiff's functional abilities. The undersigned notes that Plaintiff's argument that the ALJ erred in failing to consider whether his impairments met or equaled Listing 1.03 [Entry #17 at 34–36] is unavailing because Plaintiff has failed to demonstrate ineffective ambulation as defined by 20 C.F.R. part 404, subpt. P, app. 1, § 1.00B2b(1).[4]

---

[4] A claimant's impairment may meet Listing 1.03 where he had "[r]econstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset." 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.03. "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* at § 1.00B2b(1). "Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) **that limits the functioning of both upper extremities**." *Id.* (emphasis added).

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

November 14, 2012                        Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).